# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00370-COA

**BRUCE BERNARD WADE**  APPELLANT

**v.**

**STATE OF MISSISSIPPI**  APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/24/2022 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | DEREK L. HALL JEANINE M. CARAFELLO |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY BONNER FARMER |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | AFFIRMED - 02/13/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., McDONALD AND SMITH, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     In 2010, Bruce Wade pleaded guilty to the reduced charges of manslaughter and simple robbery, crimes committed when he was sixteen years old.  Wade was sentenced to serve twenty-five years for manslaughter, which included a five-year firearm enhancement, and to fifteen years for simple robbery, with two years suspended and thirteen years to serve, followed by two years of supervised probation.  The sentences were ordered to run consecutively.

¶2.     In 2013, Wade, represented by new counsel, filed an initial post-conviction relief (PCR) motion and then an amended PCR motion in October 2017, claiming ineffective

assistance of counsel, an involuntary guilty plea, lack of competence to enter a guilty plea, and an unconstitutional sentence. His arguments were based upon his intellectual incapacity and young age. After a hearing, the trial court denied Wade's PCR motion. Wade now appeals. Finding no error, we affirm.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3. In January 2009, Wade was indicted in Hinds County for capital murder and conspiracy to commit robbery, along with co-defendant Tevin Ward, who was also sixteen years old at the time of the offenses. The charges stemmed from events that occurred on the evening of October 3, 2008, at a gas station, where the victim came into contact with Wade and Ward. At some point, the defendants entered the female victim's vehicle. From the back seat, Wade pointed a gun at the victim, demanding money. Ward then snatched the gun out of Wade's hand, shooting and killing the victim.

¶4. A few days later, Wade was arrested at his home, one day after Ward was arrested. Wade's mother claimed that she requested to be present during Wade's police interviews but was not allowed to be present. Upon incarceration at the Raymond Detention Center, Wade was independently tested by Petra Kay for his academic level. Kay was in charge of a program sponsored by the Department of Human Services and the Jackson Public Schools for youth under the age of eighteen who were incarcerated instead of in school. Test results showed that Wade read at about a third-grade level.

¶5. Wade was represented by members of the Hinds County Public Defender's Office, who requested that Dr. Mark Webb, a psychiatrist, render an opinion regarding Wade's

2

competency. On December 4, 2009, Dr. Webb performed an independent medical examination of Wade at the Raymond Detention Center and rendered a report finding that Wade was competent to stand trial.[1] However, the results of his exam raised a question about the possibility that Wade was suffering from "mental retardation."[2] At the time, Dr. Webb did not have any information on past IQ testing of Wade but was able to obtain records of an IQ test performed in September 2007 (about one year before the crimes at hand). The testing was part of a psychoeducational evaluation performed on Wade at the University of Mississippi Medical Center.[3] Wade's full-scale IQ was 58, using the Wechsler Abbreviated Scale of Intelligence (WASI) standard. The score was classified as "extremely low" and placed Wade in the 0.3 percentile compared to the intelligence of his peers. It was found Wade also had "extremely low abstract reasoning and vocabulary skills." Accordingly, about a year later, on November 4, 2010, Dr. Webb provided Wade's public defenders with an "Addendum Medical Report" to his December 4, 2009 report, now stating that with the addition of the IQ test results, Wade "would qualify for a diagnosis of Mental Retardation which would signify very extremely low verbal skills." Dr. Webb concluded

---

[1] Dr. Webb's December 4, 2009 report is not in our appellate record, but it was listed as being admitted into evidence at Wade's PCR hearing.

[2] The term "mental retardation" has been replaced in this opinion with the term "intellectual disability."

[3] The 2007 evaluation was performed because Wade's mother sought services for her son due to his "history of difficulties in school and a lack of motivation academically." At that time, Wade was fifteen years old and in the eighth grade. The report stated that in addition to the extremely low IQ, Wade exhibited several emotional and behavioral difficulties.

3

that Wade would not be competent to stand trial due to his intellectual disability and could not understand the waiver of his rights under *Miranda v. Arizona*, 384 U.S. 486 (1966).[4]

¶6.     On December 7, 2010, Wade pleaded guilty to the reduced charges of manslaughter with a firearm enhancement and simple robbery.[5]  At the plea hearing, there was no mention made of Wade's low IQ, low verbal skills, or diagnosis by Dr. Webb of "mental retardation"; however, Wade responded appropriately to all of the questions from the judge. Wade testified that he understood his petition to enter a guilty plea and the charges against him.  He told the judge his age and level of education (through the eighth grade).  Wade affirmed that his counsel had gone over the plea petition with him.  In describing his involvement in the crimes, Wade testified that he "pulled the gun out on [the victim] and asked her for the money and she said she ain't have none, and then, I believe, some kind of way [Tevin Ward] . . . snatched the gun out of my hand and some kind of way she was shot." He claimed to be "under the influence" of some friends who were trying to get him to rob someone.  He testified that he did not mean for the victim to be murdered; he thought he "was going to rob somebody and get away."  Wade testified that he understood the State's sentencing recommendation, the maximum and minimum sentences the court could impose, the waiver of his rights, and that he had no questions for the judge.  Wade's counsel was

---

[4] The 2007 test results, Dr. Webb's December 2009 report, and the November 2010 addendum were brought before the trial court, before Wade pleaded guilty, by being attached to an amended motion to suppress his statements to police, which his public defenders filed on November 22, 2010.

[5] A few days after Dr. Webb supplemented his report, Wade's co-defendant Ward pleaded guilty and was sentenced to life imprisonment.

also questioned by the judge:

> THE COURT:  Ms. Harris, are you the attorney for the defendant?
>
> MS. MACK-HARRIS:  Yes, your Honor.
>
> THE COURT:  Have you talked with him about the petition to enter a plea of guilty?
>
> MS. MACK-HARRIS:  Yes, your Honor, I read it to him actually line by line.
>
> THE COURT:  From your observation of him today, do you see anything that would lead you to believe that he is presently intoxicated or under the influence of any drugs?
>
> MS. MACK-HARRIS:  No, your Honor.
>
> THE COURT:  And from your conversation with him, do you think he fully understands what he's doing at this time?
>
> MS. MACK-HARRIS:  Yes, your Honor.
>
> THE COURT:  Have you advised the defendant of all of his constitutional rights?
>
> MS. MACK-HARRIS:  Yes, your Honor.
>
> BY THE COURT:  Mr. Wade, are you satisfied with the services of your attorney?
>
> [WADE:]     Yes, sir.

¶7.    Three years later, on December 6, 2013, Wade, represented by new counsel, filed a timely PCR motion making several claims.  He argued he received ineffective assistance of counsel because his counsel did not effectively communicate with him about the criminal process or his rights in regard to trial and the State's burden.  Further, he complained that his counsel did not attack his indictment for capital murder or investigate "enough" his

5

"mental shortcomings and ability to stand trial." Wade also argued that he lacked competence to enter his guilty plea because he did not understand the process or the charges, thereby rendering his plea involuntary. Finally, Wade argued that his sentence was unconstitutional under *Miller v. Alabama*, 567 U.S. 460 (2012), because it was in effect a life sentence. In support of his claims, Wade attached his 2007 psychoeducational evaluation, affidavits from his mother and father attesting to his mental impairments, and an affidavit by Wade's PCR counsel stating an administrator at Wade's correctional facility was concerned about him and his impairments.

¶8. Approximately four years later, in October 2017, the State moved to dismiss Wade's PCR motion for improper service. In response, on October 23, 2017, Wade, represented by the same counsel, filed an amended PCR motion and properly served the State. He made the same arguments.

¶9. In June 2018, a hearing was held on Wade's PCR motion, focusing on his arguments of competency and ineffective assistance of counsel. Dr. Webb and Petra Kay testified for Wade. Dr. Webb testified for Wade as an expert in forensic and general psychiatry. After his initial examination of Wade in December 2009 at the Raymond Detention Center, Dr. Webb thought Wade was "competent to stand trial and was not criminally insane," but Dr. Webb wanted to obtain further testing to possibly supplement his opinion. Once Dr. Webb obtained Wade's December 2007 testing, Dr. Webb changed his mind about Wade's competency. That testing indicated Wade was intellectually disabled with an IQ of 58 and was unable to read and understand complex subjects. Therefore, Dr. Webb supplemented

6

his opinion on November 4, 2010, with an addendum to that effect. Dr. Webb opined that Wade could not understand his plea petition based on his IQ and third-grade reading level. Further, Dr. Webb testified that Wade could not appreciate his constitutional rights or the nature of his statements to law enforcement. Dr. Webb concluded that Wade was incompetent to stand trial or understand what it meant to plead guilty. After sending the addendum to Wade's public defenders, Dr. Webb had no subsequent contact with them, and Wade pleaded guilty a little over a month later. However, Dr. Webb conceded to the State that he did not know the level of explanation defense counsel provided to Wade during the plea process. Again, the State maintained that there was no evidence Wade's plea counsel did not explain to him his plea petition, its implications, and the legal process.

¶10. Kay, executive director of a child development center, also testified for Wade. She was in charge of special programming for at-risk children and youth. Although she was not testifying as an expert witness in psychiatry or psychology, she was offered as a fact witness because she worked with juvenile defendants, creating a curriculum for their education and counseling them about life skills. In 2008, she worked with Wade three times a week for almost a year during his initial incarceration. Wade was sixteen years old at the time, but she testified that based on her interaction and observation, he did not function at that level. Her testing showed Wade was reading at about a third-grade level and was "in dire need of special education." According to Kay, although she never spoke to him about legal concepts or a plea petition at all, she opined[6] that Wade did not understand the legal process, did not

---

[6] The State did not object to Kay's qualifications or testimony.

understand the *Miranda* warning, and could not have understood the legal language and nature of his plea petition. Finally, Kay testified that before Wade's guilty plea, his public defenders never consulted with her regarding him. Again, although not an expert, Kay was allowed to opine that Wade was not competent to enter a guilty plea and was intellectually disabled when he did. However, importantly, Kay admitted that she was never present during Wade's meetings with defense counsel and did not know the level of explanation provided to him. Therefore, any opinion she could offer on the depth of their conversations would rely almost exclusively on speculation and conjecture.

¶11. After the PCR hearing, Wade moved to supplement the record with Dr. Webb's affidavit and proof he had sent the 2010 addendum report to Wade's counsel before Wade pleaded guilty. At the hearing on the motion, Wade's counsel admitted the supplements would only show that the report was sent to his plea counsel, not that it was reviewed. The trial court granted Wade's motion to supplement the record.

¶12. In March 2022, the trial court denied Wade's PCR motion, finding his guilty plea was valid.

## STANDARD OF REVIEW

¶13. This Court reviews a trial court's denial or dismissal of a PCR motion to determine if the trial court's findings are clearly erroneous. Questions of law are reviewed de novo. *Peterson v. State*, 362 So. 3d 53, 56 (¶9) (Miss. Ct. App. 2021).

## ANALYSIS

¶14. Wade raises three issues on appeal: his guilty plea was invalid, his counsel was

8

ineffective, and his sentence was unconstitutional.

## I.     Guilty Plea and Competency

¶15.    Wade argues that his guilty plea was invalid because of his diminished mental capacity, which he contends prevented him from fully understanding the nature of his plea and its implication.  Relatedly, Wade claims the trial court erred by not ordering a mental examination or conducting a competency hearing before accepting his guilty plea.

¶16.    A guilty plea is valid if it is voluntarily and intelligently made by the defendant before the trial court.  *Burrough v. State*, 9 So. 3d 368, 373 (¶11) (Miss. 2009).  "A plea is considered voluntary when the defendant knows what the elements are of the charge against him, including an understanding of the charge and its relation to him, what effect the plea will have, and what the possible sentence might be because of his plea." *Williams v. State*, 220 So. 3d 996, 1000 (¶10) (Miss. Ct. App. 2017) (quoting *Montalto v. State*, 119 So. 3d 1087, 1095 (¶18) (Miss. Ct. App. 2013)).  The defendant bears "the burden of proving by a preponderance of the evidence that his guilty pleas were involuntary."  *Id.*  When reviewing the voluntariness of a guilty plea, we "will not set aside findings of a trial court sitting without a jury unless such findings are clearly erroneous."  *Walton v. State*, 16 So. 3d 66, 70 (¶8) (Miss. Ct. App. 2009) (quoting *House v. State*, 754 So. 2d 1147, 1152 (¶24) (Miss. 1999)).

¶17.    Wade notes that his public defenders brought his mental incapacity to the attention of the trial court about two weeks before his plea hearing on November 22, 2010, in an amended motion to suppress Wade's video- and audio-taped statements made to law

enforcement.[7] The seven-page motion argued that because of Wade's low intelligence, he could not have understood or appreciated his waiver of *Miranda* rights during his police interviews. The motion detailed Wade's September 2007 psychoeducational evaluation, his academic testing with Petra Kay, and Dr. Webb's December 2009 and November 2010 evaluations of Wade, all of which were attached to the motion.[8] However, Wade complains that at the plea hearing two weeks later, no mention was made by his counsel or the trial judge of Wade's low IQ and verbal skills, or Webb's diagnosis of "mental retardation."

¶18.    Because the proof of Wade's mental incapability was submitted to the trial court through the motion to suppress, Wade argues the trial court had a duty to order a mental examination under Rule 9.06[9] of the Uniform Rules of Circuit and County Court Practice, which, at the time of Wade's plea hearing, governed a defendant's competency to stand trial. The same standard is applied for competency to enter a guilty plea. *Smith v. State*, 831 So. 2d 590, 593 (¶11) (Miss. Ct. App. 2002). Rule 9.06 provided that if the trial court had a "reasonable ground to believe that the defendant [was] incompetent to stand trial, the court

---

[7] Due to the sensitive nature of the information in the motion, it was filed under seal. In 2015, the trial court granted Wade's motion to unseal the document, and it is a part of our record.

[8] It is unclear from the record if the trial court ever ruled upon the motion. In March 2017, a hearing was scheduled for the motion (seven years after it was filed), but neither the record nor the docket includes a transcript of the hearing, if it even occurred, or a ruling on the motion.

[9] At the time of Wade's plea hearing on December 7, 2010, Rule 9.06 was in effect, but effective July 1, 2017, the Mississippi Rules of Criminal Procedure replaced the Uniform Rules of Circuit and County Court Practice with regard to criminal procedure. Now Mississippi Rule of Criminal Procedure 12 governs mental examinations and competency.

shall order the defendant to submit to a mental examination by some competent psychiatrist selected by the court . . . ." Then, the court must conduct an on-the-record hearing "to determine if the defendant is competent to stand trial." *Sanders v. State*, 9 So. 3d 1132, 1136 (¶15) (Miss. 2009) (citing URCCC 9.06). Wade contends the trial court erred in not ordering a competency examination, and his guilty plea is invalid.

¶19. We disagree. While undoubtedly Wade has documented mental deficiencies, that does not mean that the trial court was required to order a mental examination. "The key phrase in assessing a trial court's responsibility to order a competency hearing is that a reasonable ground exist." *William*, 220 So. 3d at 999 (¶7). "The determination of what is reasonable rests largely within the discretion of the trial judge because the judge sees the evidence first hand and observes the demeanor and behavior of the defendant." *Id.* (quoting *Smith*, 831 So. 2d at 593 (¶11)). The focus of a competency inquiry is whether the defendant had "the ability to understand the proceedings." *Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993).

¶20. Wade's plea hearing transcript does not support a claim of mental incapacity. Although no mention was made of Wade's low IQ, the trial judge asked Wade about his educational level, his understanding of the charges and sentences, the waiver of his rights, his satisfaction with his attorney, and his advisement of the sentences for the crimes, as well as explaining to Wade the consequences of the plea. Wade responded appropriately to all of the judge's questions. "Great weight may be placed on a defendant's sworn testimony given at a plea hearing, because solemn declarations in open court carry a strong

presumption of verity." *Evans v. State*, 114 So. 3d 778, 781 (¶9) (Miss. Ct. App. 2013). There was no indication in the transcript that Wade could not understand the proceedings, and the trial court judge, who viewed the behavior and demeanor of Wade first hand, apparently did not find reasonable grounds existed to order a mental examination. Further, Wade signed the sworn plea petition, which covered the elements of the charges, possible sentences, and factual basis of the plea. The plea hearing transcript and his plea petition indicate Wade understood his plea and was competent to make it.

¶21. At Wade's PCR hearing, although Dr. Webb and Kay expressed concerns about Wade's mental capacity to plead guilty, they were not present when Wade and his plea counsel met to discuss his defense; so they could not express an accurate opinion about how much Wade's plea counsel explained to him. Wade appeared to have sufficient competency to proceed to trial under the standard cited in *Dusky v. United States*, which was later applied to pleading guilty—the "test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960); *accord Godinez*, 509 U.S. at 398.

¶22. Wade claims his guilty plea was not voluntary or intelligent because he was "mentally incapable of legally entering a guilty plea"—he could not understand his plea, the elements of the crimes charged, and the plea's consequences. As proof, Wade points to his full-scale IQ of 58, his third-grade level reading ability, Dr. Webb's December 2009 exam and November 2010 addendum, and Dr. Webb's opinion that Wade would qualify for a

12

diagnosis of "mental retardation."

¶23. Again, we disagree. Even though Wade has a low IQ of 58,[10] that does not mean that he was incompetent to plead guilty. "There is no requirement that a person possess a certain intelligence level as measured by IQ testing or have participated in a certain curriculum in order to enter a guilty plea." *Higginbotham v. State*, 367 So. 3d 200, 206 (¶28) (Miss. Ct. App. 2020) (quoting *Tenner v. State*, 868 So. 2d 1067, 1069 (¶9) (Miss. Ct. App. 2004)). "Instead, the determination that a plea is offered knowingly and voluntarily is an issue for investigation in each case." *Tenner*, 868 So. 2d at 1069 (¶9). Even if such a requirement existed, in Mississippi, a defendant with a full-scale IQ of 61 has been found competent to plead guilty. *Higginbotham*, 367 So. 3d at 206 (¶27). Further, in Nebraska, a defendant with a full-scale IQ of 59 was found competent to plead guilty. *State v. Quarrels*, 318 N.W.2d 76, 78 (Neb. 1982).

¶24. We conclude that even though Wade had a low intellectual ability, his plea petition and responses at his plea hearing support the trial court's determination that his plea was voluntary and intelligent. We cannot find that the trial court's decision was "clearly erroneous." Further, the record does not show that the trial court, having listened to Wade's responses at the plea colloquy, erred in not ordering a mental examination under Rule 9.06.

## II.    Ineffective Assistance of Counsel

---

[10] The DSM-IV classifies the severity of an intellectual disability with an IQ of 58 as a "mild," with ranges of 50-69. National Library of Medicine, *Mental Disorders and Disabilities Among Low-Income Children*, https://www.ncbi.nlm.nih.gov/books/NBK332877/#:~:text=DSM%2D5%20defines%20intellectual%20disabilities,and%20practical%20areas%20of%20living (2015).

¶25. Next, Wade claims that he received ineffective assistance of counsel because his plea counsel did not "explain anything about the criminal process" and did not challenge his indictment for capital murder.

¶26. To succeed on an ineffective-assistance-of-counsel claim, the defendant must show that (1) his attorney's performance was deficient, and (2) the deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). However, a voluntary guilty plea waives ineffective assistance of counsel claims unless the claim relates to the voluntariness of the plea. *Townsend v. State*, 344 So. 3d 858, 862 (¶10) (Miss. Ct. App. 2022). Thus, "[i]n the context of a guilty plea, one must show counsel's errors proximately resulted in the guilty plea[,] and, but for counsel's error, the defendant would not have entered the guilty plea." *Moore v. State*, 248 So. 3d 845, 850 (¶14) (Miss. Ct. App. 2017) (internal quotation marks omitted). There is a strong presumption that an attorney's conduct falls within the wide range of reasonable professional assistance. *Williams*, 220 So. 3d at 1001 (¶15).

¶27. Wade claims his appointed counsel was deficient in failing to explain his rights regarding trial or the State's burden should he go to trial. Further, Wade argues that his counsel was deficient in failing to attack his initial indictment for capital murder, which potentially could have carried a penalty of death at the time the crime occurred.[11] Wade claims his counsel should have filed a motion to quash his indictment due to the United

___

[11] Wade's age would have prevented the imposition of the death penalty. *See Roper v. Simmons*, 543 U.S. 551, 578 (2005) ("The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed.").

States Supreme Court's holding that the execution of "mentally retarded" defendants violates the Eighth Amendment in *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).[12] Finally, Wade argues that his counsel should have more fully investigated Wade's mental shortcomings and sought an order from the trial court before Wade pleaded guilty for him to submit to a mental examination regarding competency.

¶28. "A defendant's claims of ineffective assistance of counsel must be pled with specificity, and the claim must be supported by affidavits other than his own." *Tran v. State*, 373 So. 3d 597, 600 (¶7) (Miss. Ct. App. 2023) (quoting *Luckett v. State*, 346 So. 3d 509, 511 (¶5) (Miss. Ct. App. 2022)). "When a movant fails to attach any supporting affidavits and relies solely on his own sworn motion, his ineffective-assistance claim must fail." *Id.* Here, Wade provided affidavits other than his own from his retained lawyer and his parents; however, they only pertained to Wade's mental ability and not any ineffective assistance of the public defenders to have Wade plead guilty when they had knowledge of his mental shortcomings. At the plea hearing, however, Wade claimed he was satisfied with his counsel's performance. The trial court explained Wade's rights and the consequences of his plea. Regarding a challenge to his indictment, *Atkins* did not prohibit the State from indicting an intellectually disabled defendant of capital murder but, rather, prohibits the death penalty from being imposed. *Atkins*, 536 U.S. at 321. Finally, Wade's plea counsel was aware of his mental shortcomings, as seen in the exhibits to his motion to suppress. Moreover, at the plea hearing, Wade's counsel stated that she had discussed his plea with

_____

[12] The defendant in *Atkins* had a full-scale IQ of 59, which was one point higher than Wade's IQ. *Id.* at 309.

15

him and that he "fully understood" it. We find no merit to these arguments. Wade fails to show that but for his counsel's deficiencies, he would not have pleaded guilty.

### III. Sentence

¶29. Finally, Wade argues that his sentence is unconstitutional under *Miller v. Alabama*, 567 U.S. 460 (2012). *Miller* held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Id.* at 479. Wade claims that his sentences were "tantamount to a life sentence" given his age of eighteen years old at the time of sentencing and his total time of thirty-eight years for the two sentences to be served consecutively.

¶30. Wade's argument is without merit. *Miller* does not apply here. The two felonies Wade was convicted of—manslaughter and simple robbery—do not mandate life imprisonment. Moreover, Wade has not established that thirty-eight years constitutes a life sentence in this case. Wade's sentences are lengthy, but they are not unconstitutional.

## CONCLUSION

¶31. Based on the foregoing, we affirm the order denying Wade's PCR motion.

¶32. **AFFIRMED.**

**WILSON, P.J., GREENLEE, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. EMFINGER, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., WESTBROOKS AND McDONALD, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**